**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re ) | |
| ) | |
| REPOSITORY TECHNOLOGIES, INC., ) | |
| ) | |
| Debtor/Debtor-in-Possession. ) | |
| _____) | Case No. 07 C 1857 |
| WILLIAM G. NELSON, ) | |
| ) | |
| Appellant/Cross-Appellee, ) | |
| ) | Appeal from Bankruptcy |
| v. ) | Case No. 06-B-04582 |
| ) | Adversary Case No. 06-A-1247 |
| REPOSITORY TECHNOLOGIES, INC., ) | |
| ) | |
| Appellee/Cross-Appellant. ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court are William G. Nelson's ("Nelson") and Repository Technologies,

Inc.'s ("RTI") cross-appeals from: (1) the Judgment Order on Debtor RTI's Adversary

Complaint for Recharacterization from Debt to Equity, for Equitable Subordination, and to

Recover for Breaches of Fiduciary Duty and (2) the Findings of Fact and Conclusions of Law

Following Trial in Adversary Case No. 06-A-1247. Nelson initiated this appeal by filing a

Notice of Appeal on February 23, 2007. RTI cross-appealed by filing a Notice of Appeal on

March 1, 2007. The Court has jurisdiction to hear the appeal and cross-appeal pursuant to 28

U.S.C. § 158(a)(1) and Federal Rules of Bankruptcy Procedure 8001, *et seq.* For the following

reasons, the Court affirms the Bankruptcy Court's Judgment Order and Findings of Facts and

Conclusions of Law.

**STANDARD OF REVIEW**

On an appeal from the bankruptcy court, "the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Id.* Accordingly, the Court reviews the Bankruptcy Court's findings of fact for clear error and reviews its conclusions of law *de novo*. *In re ABC-Naco, Inc.,* 483 F.3d 470, 472 (7th Cir. 2007). The Court reviews mixed questions of fact and law de novo. *Mungo v. Taylor,* 355 F.3d 969, 974 (7th Cir. 2004).

## PROCEDURAL BACKGROUND

RTI, the debtor, filed a voluntary Chapter 11 petition on April 25, 2006. On June 27, 2006, Nelson filed an amended motion to dismiss pursuant to 11 U.S.C. § 1112(b), or, in the alternative, for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) or (d)(2). On July 28, 2006, RTI filed Adversary Proceeding No. 06-A-1247 against Nelson. The Bankruptcy Court consolidated the trial of RTI's Adversary Complaint with the trial on Nelson's motion to dismiss. On August 10, 2006, Nelson filed a motion for summary judgment on the Adversary Complaint. After briefing by the parties, the Bankruptcy Court determined that there were triable issues of fact. Consequently, the Bankruptcy Court deferred ruling on Nelson's summary judgment motion until after the completion of the trial.

At the start of trial on August 28, 2006, RTI and Nelson agreed that the facts that the parties had identified in their summary judgment statements would be admitted into evidence as uncontroverted to the extent that the parties did not object to a particular fact. Thereafter, the

Bankruptcy Court heard trial testimony on August 29, 2006 and October 24, 2006. The parties also submitted exhibits into evidence. At the close of RTI's case on August 29, 2006, Nelson filed a motion for judgment as a matter of law. The Bankruptcy Court deferred its ruling on Nelson's motion for judgment as a matter of law until the completion of the trial. At the completion of the trial, the Bankruptcy Court struck the motions for judgment as a matter of law and summary judgment as moot and entered the Judgment Order and the Findings of Facts and Conclusions of Law.

## STATEMENT OF FACTS

The Court bases its summary of the facts on the Bankruptcy Court's Statement of Facts set forth in the February 13, 2007, Findings of Fact and Conclusions of Law. *See* 06-A-1247, R. 91-1; *In re Repository Tech.,* 363 B.R. 868 (Bankr. N.D. Ill. 2007).

### I.      The Parties

At the time RTI filed its bankruptcy petition, it was a Delaware corporation with its principal place of business in Lisle, Illinois. RTI marketed, supplied, and maintained software pursuant to the terms of various software licensing agreements with its customers. During the relevant time period, Nelson was a shareholder of RTI, Chief Executive Officer of RTI, and served on RTI's Board of Directors. Nelson also served as RTI's Chairman through April 11, 2006. Since 1996, RTI's Board of Directors has had between three to five directors. Besides Nelson, other board members have included RTI's principal shareholders – James Emerson and Kathleen Emerson.

### II.     RTI's Business

RTI obtained revenue from three primary sources: (1) new sales of software licenses; (2)

upgrades of pre-licensed software to customers with specialized needs; and (3) maintenance and customer support of existing software licenses. James Emerson, RTI's President, had the responsibility of keeping RTI's books and records, including payroll and the tracking of employee reimbursements and expenses. James and Kathleen Emerson owned 37.02 percent and 29.82 percent of the equity interests in RTI, respectively.

## III.    The Nelson Claim

On July 31, 2006, Nelson filed its secured proof of claim in RTI's bankruptcy case in an amount in excess of $2,346,072 ("Nelson Claim"). The Nelson Claim reflects loans Nelson made to RTI personally and money from the outstanding balance on a note which Nelson purchased for face value from West Suburban Bank.

### A.    Nelson's Loans & Advances to RTI

At a Special Meeting of RTI's Directors on July 10, 2002, the directors discussed whether RTI should enter into a credit agreement with Nelson. Nelson left the meeting to allow the other directors to discuss and vote on the issues discussed, and – as the prospective lender – Nelson did not vote on whether RTI should borrow funds from him. The remaining directors, including James and Kathleen Emerson, voted in favor of entering into a line of credit to be advanced by Nelson.

On August 30, 2002, RTI – through its president James Emerson – executed a Revolving Credit Note with Nelson ("Nelson Note), which granted RTI a line of credit up to $500,000 at an interest rate of 15% with interest due monthly until August 1, 2007, when the entire balance was scheduled to become due. Also on August 30, 2002, RTI executed a Commercial Revolving Loan and Security Agreement ("Nelson Security Agreement") that granted Nelson "a security

interest in, <u>all assets of the Debtor</u> . . . to secure payment to [Nelson] of the Obligations . . ." As of the date of the filing of RTI's bankruptcy case, the Nelson Security Agreement imposed a lien on all of RTI's assets. Initially, Nelson advanced at least $500,000 to RTI under the Nelson Note and Nelson Security Agreement.

On December 19, 2003, the RTI Directors held a regular meeting at which all RTI Directors attended. At the meeting, a director moved to increase the Nelson Line of Credit to $1,500,000. The motion carried by a vote of 3 to 0 with 2 abstentions. Both Kathleen Emerson and Nelson abstained from the vote. Despite the increased line of credit, the parties did not execute any new loan documents, security agreements, or UCC-1 financing statements in conjunction with this additional loan. Prior to the December 19 meeting, Nelson had already advanced $740,000 over his initial loan of $500,000. In short, from July 11, 2002 through May 28, 2004, Nelson had advanced funds to RTI that totaled between $1,740,000 and $1,785,000 although the Board never authorized more than the $1,500,000.

Nevertheless, RTI kept an internal record entitled "Revolving Credit Statement, William G. Nelson" in which it recorded the Nelson Loans and also recorded all interest payments it made to Nelson with respect to those loans. RTI paid interest on the Nelson Loans through June 2, 2004. It paid such interest on the entirety of the Nelson Loans outstanding at the time of each payment at the rate of 15% per annum, which was the rate provided by the original Nelson Loan documents.

RTI's balance sheet listed the Nelson Loans as a liability. The 2004 Corporate Tax Return that RTI's accountants prepared and filed on behalf of RTI reported that the Nelson Advances comprised a liability in the amount of $1,785,000. Further, in an attachment to a letter

to RTI Investors, dated February 27, 2006, RTI indicated that it had notes payable to its director, Nelson, in the amount of $1,785,000. In open court on December 28, 2006, however, counsel for the parties stipulated that the total of Nelson's advances was only $1,740,000.

At the time of each advance, Nelson was a director and shareholder of RTI and, for a period, was RTI's salaried Chief Executive Officer. Nelson gave money to RTI as more cash was needed to pay bills and payroll that could not otherwise be paid. Nelson advised RTI that he did not expect to be paid on his debt until RTI "was no longer in trouble," that the funds advanced by him were not that significant to him, and that – if needed – he could simply take the loss emanating from not being repaid. Nelson, however, never waived his ultimate right and intent to collect his advances to RTI when RTI's business improved.

### B. The Bank Note

On or about October 1, 2004, RTI executed a Promissory Note in favor of West Suburban Bank in the amount of $202,461. Also on October 1, 2004, RTI executed a Commercial Security Agreement granting the Bank a lien against "[a]ll Inventory, Chattel Paper, Accounts, Equipment and General Intangibles" of RTI, which was properly perfected. Meanwhile, RTI stayed current on its obligations with respect to the Bank Note from October 2004 through the filing of its bankruptcy petition on April 25, 2006. At all times that the Nelson Loans were outstanding, RTI had financing from the Bank.

In March 2006, Nelson, while still serving as a director of RTI, contacted the Bank to acquire the Bank Note for himself. Nelson then purchased the Bank's interests in the Bank Note and the West Suburban Security Agreement for the face value of the outstanding principal due and owing under those obligations  – which amounted to $126,484. On April 10, 2006, the Bank

assigned its interest in the Bank Note and the West Suburban Security Agreement to Nelson. Nelson did not receive any special benefit due to his status or affiliation with RTI during the process of acquiring the Bank Loan.

As of the bankruptcy filing date, Nelson, as successor to the Bank Note, held a valid secured claim in the amount of $126,484.01, plus any accrued interest and possible attorney's fees and costs. Earlier, on September 1, 2002, RTI, the Bank, and Nelson executed a Subordination Agreement which completely subordinated each loan and advance from Nelson to RTI to the interests of the Bank. It barred Nelson from forcing collection or enforcing his security position without the Bank's consent. At the time of this subordination, the Bank was RTI's major, non-contingent creditor. The Subordination Agreement permitted RTI to pay interest payments on the Nelson debt as long as it was not in default on the Bank Loan. The Subordination Agreement also permitted the Bank to assign the loan to anyone at any time without notice to RTI.

Nelson purchased the Bank Loan on or about April 4, 2006 – while he was still a director of RTI – by paying off the Bank Loan balance from his own personal funds. On April 10, 2006, while still serving as a director, Nelson obtained an assignment of the Bank's UCC-1 financing statements from the Bank. On April 12, 2006, Nelson received the Bank's Note (with the assignment) and Security Agreement relating to it.

Nelson's acquisition of the Bank Loan at a time when RTI was current on the loan increased Nelson's claims against RTI by the amount of the Bank Loan and elevated Nelson into the position as the only secured creditor of RTI. At no point prior to April 11, 2006, did Nelson ever inform RTI, its Board, or its Officers that he had acquired the Bank Loan with his personal

funds or that he had obtained an assignment of the Bank Loan and Bank liens on RTI's assets.

**IV.**     **Nelson's Resignation & Delivery of Default Notice**

On April 11, 2006, Nelson resigned as a director of RTI. Also on April 11, 2006, but subsequent to the delivery of his resignation, Nelson delivered to James Emerson a Notice of Default. The Default Notice asserted Nelson's secured claim and informed RTI that it had failed to make approximately $509,687 in scheduled interest payments on the Nelson Loans since June 2004. It further noted that neither the terms of the Nelson Line of Credit nor the Nelson Security Agreement required Nelson to notify RTI that it was in default with respect to the agreements. Other than informing RTI of the default, the Default Notice did not contain any other statements regarding Nelson's future intentions. In addition, the Default Notice did not contain any specific threats regarding enforcement of the terms of the Nelson Line of Credit or the Nelson Security Agreement through litigation or other enforcement action, but did demand that RTI make the Nelson Loans current within 15 days, or Nelson would consider a default to have occurred under terms of the documents. The Bankruptcy Court concluded that Nelson's statement implied that after the 15-day deadline, he would have all rights to redress held by him as a secured creditor following default.

After tendering his resignation and the Default Notice, Nelson did not seize or take further steps in an attempt to seize RTI's assets, nor did he file foreclosure proceedings or take any other overt action to collect the amounts due under the Nelson Loans. Because RTI did not have the financial ability to bring the Nelson Loan current within 15 days, RTI filed the present bankruptcy action to obtain protection from any possible action by Nelson. At no time did Nelson actually form a new corporation to accept, hold, or manage the assets or business of

RTI. Nelson, however, consulted his counsel about the possibility of doing so. Nelson also contemplated replacing RTI management and putting its assets into a new company under new management.

Upon receipt of the Default Notice, RTI requested that Nelson extend the deadline for curing the default. Nelson's response was that unless RTI agreed to turn over its assets to a new entity to be formed and controlled by Nelson, Nelson would not agree to extend the deadline.

## V.      RTI's Bankruptcy Filing

RTI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 25, 2006. As of the Petition Date, RTI was substantially current on all of its debt. Also as of the Petition Date, RTI had only two or three trade creditors with a combined indebtedness of approximately $2,300 and was indebted to a former landlord in the approximate amount of $30,000. The remainder of the approximately $400,000 in scheduled unsecured claims related to claims for unearned maintenance attributable to the remaining life on multiple customer contracts.

## VI.     Bankruptcy Court's Conclusions

In advance of its February 13, 2007, Findings of Fact and Conclusions of Law and Judgment Order, the Bankruptcy Court told the parties about the nature if its judgment. Thereafter, the Bankruptcy Court dismissed RTI's bankruptcy action because RTI admitted that it could not reorganize under Chapter 11 of the Bankruptcy Code. In its decision, the Bankruptcy Court explained:

> Absent sale, and in light of concession that Debtor cannot reorganize under
> Chapter 11 of the Bankruptcy Code, this case must be dismissed. Inability to
> effectuate a Plan in Chapter 11 is certainly a basis for dismissal. Other grounds
> were argued in favor of dismissal, but they were not established. Nelson has not

shown:

> a. continuing loss to or diminution of the estate during the bankruptcy;
> b. any mismanagement of Debtor's assets and business; or
> c. the filing of a bankruptcy case and petition in bad faith.

Present management has kept the Debtor's business stable and operations have shown progress and efficient operation. The filing of this bankruptcy was a rational reaction to Nelson's actions, and was partially successful. Therefore, the bankruptcy filing cannot be held to be in bad faith.

However, because Debtor cannot reorganize, the case will be dismissed on Nelson's Motion unless Debtor can demonstrate a potential viable sale.

*In re Repository Tech., Inc.,* 363 B.R. at 896.

The Bankruptcy Court also entered judgment on RTI's Adversary Complaint in Nelson's favor. Specifically, the Court did not equitably subordinate Nelson's claims, did not transfer Nelson's liens to the estate, and concluded that Nelson's advances over $1,500,000 – totaling $240,000 – would be recharacterized as equity. Accordingly, the total debt RTI owed to Nelson on the Nelson Loans and Bank Loan was $1,793,320.

## VII. Sale of RTI's Assets

On February 13, 2007 – the same day that the Bankruptcy Court entered its Findings of Fact and Conclusions of Law and Judgment Order – Nelson filed a Complaint in federal court against RTI based on RTI's default concerning the Nelson Loans and Promissory Note assigned from West Suburban Bank. (07 C 0861, R. 1-1, Compl.) On February 14, 2007, another judge in this district entered a Temporary Restraining Order ("TRO") enjoining RTI from "causing or taking any action to cause the Funds to be moved, withdrawn, transferred, secreted, or otherwise affected" pending resolution of Nelson's claims. (07 C 0861, R. 19-1, TRO Order, at 2.) On March 2, 2007, the district court appointed a Receiver to operate RTI's business operations and assets. (07 C 0861, R. 38-1, 39-1, Receiver Order). On March 20, 2007, Nelson, as a secured

party, sold all of RTI's assets for $475,000 and the Receiver acknowledged Nelson's bills of sale and transferred RTI's assets to the successful bidder – who was Nelson himself. (07 C 0861, R. 46-1, Receiver's Final Report, at 2.) On June 7, 2007, the district court entered an order approving the Receiver's Final Report and the Uniform Commercial Code sale of RTI's assets. (07 C 0861, R. 52-1, Approval Order.) The district court then dismissed Nelson's Complaint without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). (*Id*.)

## JURISDICTION

For the first time in his reply brief, Nelson contends that the Court does not have jurisdiction to consider RTI's appeal because there is no live "case or controversy."[1] Nelson bases his argument on the intervening event of the sale of RTI's assets in support of his claim that the Court cannot afford RTI any relief on appeal, and thus this matter is moot. Because RTI did not have a sufficient opportunity to address Nelson's jurisdictional argument made for the first time in reply, the Court directed the parties to file supplemental briefs concerning the Court's jurisdiction, which the Court has since considered.[2]

"Federal courts may not give opinions on moot questions or abstract propositions."

---

[1] In general, arguments raised for the first time in a reply brief are waived. *See Amerson v. Farrey,* 492 F.3d 848, 852 (7th 2007). Nevertheless, because Nelson's raises the issue of the Court's jurisdiction – the threshold question in every case – the Court will address Nelson's arguments. *See Sims v. EGA Products, Inc.,* 475 F.3d 865, 867 (7th Cir. 2007) (jurisdiction is court's "first order of business").

[2] For the first time in his supplemental brief to the Court, Nelson argues that the Court should vacate the Bankruptcy Court's decision. Because Nelson brings this argument for the first time in his supplemental brief, he has waived this argument. *See United States v. Harris,* 394 F.3d 543, 559 (7th Cir. 2005) (requests "absurdly" late and waived because they were not raised in opening brief or even in reply brief). Nelson's other arguments made for the first time in his supplemental or reply brief are similarly waived. *See id.*; *Amerson,* 492 F.3d at 852.

11

*Dorel Juvenile Group, Inc. v. DiMartinis,* 495 F.3d 500, 503 (7th Cir. 2007); *see also Protestant Mem'l Med. Ctr., Inc. v. Maram,* 471 F.3d 724, 729 (7th Cir. 2006) ("Mootness is one of the concepts that comprise the threshold issue of justiciability."). "An appeal should 'be dismissed as moot when, by virtue of an intervening event, a court of appeals cannot grant 'any effectual relief whatever' in favor of the appellant.'" *Dorel Juvenile Group,* 495 F.3d at 503 (quoting *Calderon v. Moore,* 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996)). Nevertheless, "[e]ven when it is no longer possible to restore the parties to the positions they used to occupy, the case remains live while 'a court can fashion *some* form of meaningful relief.'" *In re UNR Indus., Inc.,* 20 F.3d 766, 768 (7th Cir. 1994) (citing *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (emphasis in original); *see also Flynn v. Sandahl,* 58 F.3d 283, 287 (7th Cir. 1995) (proper test for mootness on appeal is whether it is possible to fashion some form of meaningful relief to appellant if he prevails on the merits).

Here, RTI contends that the Court can fashion "some form of meaningful relief" if the Court reverses the Bankruptcy Court's determinations concerning the recharacterization of Nelson's debt, the equitable subordination of Nelson's debt, and Nelson's liens on RTI's property after which "RTI would reinstate its business operations and retrieve all of its customer contracts and related assets sold to Nelson at his own foreclosure sale." (R. 28-1, RTI Supp. Brief, at 6.) In support of its argument that it could reinstate its business operations despite the sale of its assets, RTI relies on the following language from *In re Resource Tech. Corp.,* 430 F.3d 884, 886 (7th Cir. 2005):

> Unscrambling a transaction may be difficult, but it can be done. No one (to our knowledge) thinks that an antitrust or corporate-law challenge to a merger becomes moot as soon as the deal is consummated. Courts can and do order divestiture or damages in such situations. Perhaps [the appellant] has in mind not

mootness but judicial reluctance to upset legitimate reliance interests.

*Id.* at 886-87 (citing 11 U.S.C. § 363(m)). Indeed, although RTI fails to address the policy

favoring finality in bankruptcy sales, the Bankruptcy Code does not forbid all forms of collateral

attack – such as a motion pursuant to Federal Rule of Civil Procedure 60(b) and Bankruptcy

Rule 9024 challenging the district court's June 7, 2007 order approving the sale of RTI's assets.

*See In re Edwards,* 962 F.2d 641, 643-44 (7th Cir. 1992).

Therefore, it is possible for the Court fashion "some form of meaningful relief" if the

Court reverses the Bankruptcy Court's rulings in RTI's favor and RTI challenges the asset sale

pursuant to Rule 60(b). Accordingly, Nelson has failed in his burden of establishing mootness,

and the Court has jurisdiction over RTI's appeal. *See Dorel Juvenile Group,* 495 F.3d at 503.

The Court thus turns to the parties' arguments on cross-appeal.

## ISSUES PRESENTED FOR REVIEW

On March 5, 2007, Nelson filed his Appellant's Statement of Issues To Be Presented On

Appeal and Designation of Content of Record on Appeal raising the following issues: (1)

whether the Bankruptcy Court erred in failing to grant Nelson's motion for summary judgment;

(2) whether the Bankruptcy Court erred in failing to grant Nelson's judgment as a matter of law;

(3) whether the Bankruptcy Court erred in recharacterizing a portion of Nelson's claim against

the estate from debt to equity; (4) whether the Bankruptcy Court erred in recharacterizing

Nelson's claim from debt to equity without RTI having joined all parties determined by the

Bankruptcy Court to have been necessary to afford the relief sought; (5) whether the Bankruptcy

Court had jurisdiction and/or the authority to enter an order recharacterizing Nelson's debt claim

to equity while the underlying bankruptcy case was on the verge of dismissal; and (6) whether

the Bankruptcy Court erred in making findings of fact and drawing conclusions of law that went

beyond matters necessary to resolve the issues presented.[3]

RTI filed its Statement of Issues to Be Presented on Appeal and Cross-Appeal and

Additional Designation of Record on Appeal and Cross-Appeal raising the following issues: (1)

whether the Bankruptcy Court erred in failing to recharacterize all or more of the Nelson debt;

(2) whether the Bankruptcy Court erred in failing to equitably subordinate Nelson's debt and

recharacterize debt against RTI pursuant to 11 U.S.C. § 510(c)(1); (3) whether the Bankruptcy

Court erred in failing to direct the transfer of Nelson's liens on RTI's property to RTI's

bankruptcy estate pursuant to 11 U.S.C. § 510(c)(2); and (4) whether the Bankruptcy Court erred

in failing to find that Nelson breached his fiduciary duties owing to RTI, its creditors, and its

shareholders.

## ANALYSIS

## I.     Recharacterization of Debt to Equity

First, Nelson argues that the Bankruptcy Court erred in entering an order recharacterizing

$240,000 of his claim against the estate from debt to equity. On the other hand, RTI contends

that the Bankruptcy Court erred in failing to recharacterize all of Nelson's debt – $1,7400,000 –

or at least more of RTI's debt to Nelson as equity.

When a creditor has contributed capital to a debtor as a loan, but the loan has the

---

[3] In his legal memoranda to the Court, Nelson fails to articulate any arguments in support of his claims that the Bankruptcy Court erred in failing to grant his motion for summary judgment and judgment as a matter of law or that the Bankruptcy Court did not have jurisdiction to recharacterize his debt while the case was "on the verge of dismissal." Based on the absence of any discussion in his legal briefs concerning these issues presented for review, Nelson has abandoned these claims. *See Steen v. Myers,* 486 F.3d 1017, 1020-21 (7th Cir. 2007).

character and substance of equity, bankruptcy courts may recharacterize the debt as equity –
even if the other requirements of equitable subordination are not satisfied. *In re Kids Creek
Partners, L.P.*, 212 B.R. 898, 931 (Bankr. N.D. Ill. 1997). As such, courts treat the
recharacterization of debt as equity capital separately from equitable subordination. *In re
Lifschultz Fast Freight,* 132 F.3d 339, 345 n.3 (7th Cir. 1997); *see also In re Kids Creek
Partners, L.P.,* 212 B.R. at 931 ("Although recharacterization of debt as equity is often thought
of as a subset of equitable subordination, it is actually a distinct cause of action."). The effect of
recharacterizing debt as equity "is subordination of the claim as a proprietary interest because
the corporation repays capital contributions only after satisfying all other obligations of the
corporation." *In re Outboard Marine Corp. v. Quantum Indus. Partners, LDC,* No. 02 C 1594,
2003 WL 21697357, at *3 (N.D. Ill. July 22, 2003).

In determining whether a debt should be recharacterized as equity capital, courts consider
the following factors: (1) the names given to the instruments evidencing indebtedness; (2) the
presence of a fixed maturity date and schedule of payments; (3) the presence of a fixed rate of
interest and interest payments; (4) the source of repayments; (5) the adequacy of capitalization;
(6) the identity of interest between the creditor and the stockholder; (7) any security for the
advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9)
the extent to which the advances were subordinated to the claims of outside creditors; (10) the
extent to which the advances were used to acquire capital assets; and (11) the presence of a
sinking fund to provide repayments. *In re S.M. Acquisition Co.,* No. 05 C 7076, 2006 WL
2290990, at *9 (N.D. Ill. Aug. 7, 2006) (citing *Roth Steel Tube Co. v. C.I.R.,* 800 F.2d 625, 630
(6th Cir. 1986)); *see also In re Autostyle Plastics, Inc.,* 269 F.3d 726, 749-50 (6th Cir. 2001).

Some courts have added two additional factors, including the ration of shareholder loans to capital and the amount or degree of shareholder control. *See, e.g., In re Outboard Marine Corp.,* 2003 WL 21697357, at *5; *In re Hyperion Enter.*, 158 B.R. 55, 561 (D. R.I. 1993). Many of these factors go to whether the transaction has the earmarks of an arm's length commercial lending agreement, namely, whether the terms are similar to a regular commercial loan. *In re Kids Creek Partners, L.P.*, 212 B.R. at 931; *see e.g., Frierdich v. C.I.R.,* 925 F.2d 180, 183 (7th Cir. 1991). "No one factor is controlling or decisive, and the court must look to the particular circumstances of each case." *Roth Steel Tube,* 800 F.2d at 630.

A court's recharacterization analysis is a "factual determination of whether or not the asserted debt is in fact a debt or is instead an equity contribution disguised as debt." *In re Outboard Marine Corp.*, 2003 WL 21697357, at *4; *see also Roth Steel Tube,* 800 F.2d at 629 ("question of whether advances to a corporation constitute capital contributions or loans is a question of fact"). The Court reviews the Bankruptcy Court's findings of fact for clear error. *See In re ABC-Naco, Inc.,* 483 F.3d at 472; *In re Lifschultz Fast Freight,* 132 F.3d at 343. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Outboard Marine Corp.,* 386 F.3d 824, 827 (7th Cir. 2004) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). A district court cannot disturb a bankruptcy court's factual findings because the district court would have decided the case differently. *See Mungo v. Taylor,* 355 F.3d 969, 974 (7th Cir. 2004).

Here, the Bankruptcy Court recharacterized Nelson's advances that exceeded $1,500,000 as equity. *See In re Repository Tech.,* 363 B.R. at 880. Specifically, the Bankruptcy Court

found that:

> The evidence is overwhelming that from the beginning and at all times thereafter both parties viewed Mr. Nelson's advances up to $1,500,000 as debt. The timing of the advances, the subsequent perfection of Mr. Nelson's security interest, and timing of Board approval of advances are irrelevant because the advances were undeniably made and authorized or ratified by the Board and the lien created thereby undeniably granted and later perfected. The date of perfection is of little economic relevance in a case where the claims of Nelson and other creditors are not affected by the timing of perfection.
>
> Mr. Nelson's advances up to $1,500,000 were approved, documented adequately, repeatedly acknowledged by RTI, and serviced by interest payments at the agreed rate. When Nelson made advances above that level that were not Board approved or documented, he did so to keep RTI afloat to protect his interests in ultimately recovering on his earlier advances, the motive of an investor. Had he deemed those advances to be further loans he would have insisted on further Board approval or other documentation. Had the RTI Board considered the extra advances to be loans, it would have approved them. Because Nelson did not obtain Board approval or other documentation, the $240,000 was his investment rather than RTI's debt.
>
> In June 2004, Nelson explicitly refused to make further advances, and in October 2004, the Bank refused new loans and converted all existing debt to a fixed obligation. In 2004, therefore, both Nelson and the Bank considered RTI a financial risk more so than in prior years.
>
> Therefore, Nelson's advances over $1,500,000 will be considered investments, while those up to that limit were proper loans that RTI cannot now repudiate through recharacterization.

*Id.* at 882.

On appeal, Nelson argues that there is no evidentiary basis for the Bankruptcy Court's factual finding that his advances in excess of $1,500,000 were of a different character than the advances he made up to that point. Contrary to Nelson's argument, as noted above, there is evidence in the record that the Board did not approve of Nelson's advances over $1,500,000 and that Nelson gave more cash as needed to pay bills and payroll. Nelson also contends that there is no factual basis that he considered RTI more of a financial risk in 2004, despite the June 25,

2004, Board meeting minutes indicating that because company sales were not improving, Nelson was "not prepared to increase the companies' line of credit in order to fund further sales efforts." There is also evidence in the record that due to the recession in business investment in general and software spending in particular, Nelson suspended his line of credit sometime in 2004. (*See* Sept. 29, 2004, Emerson Memo to Investors).

After reviewing the evidence in the record, the Court is not left with a definite and firm conviction that the Bankruptcy Court made a mistake in recharacterizing Nelson's $240,000 advance as equity. *See In re Outboard Marine Corp.,* 386 F.3d at 827; *Mungo,* 355 F.3d at 974. Therefore, the Bankruptcy Court's findings are not clearly erroneous, especially in light of the due regard the Court gives the Bankruptcy Court's credibility determinations. *See In re Marrs-Winn Co., Inc.,* 103 F.3d 584, 589 (7th Cir. 1996); Fed.R.Bankr.P. 8013. Moreover, even when the record supports two permissible conclusions, a factfinder's choice cannot be clearly erroneous. *See In re Rovell,* 194 F.3d 867, 872 (7th Cir. 1999); *In re Weber,* 892 F.2d 534, 538 (7th Cir. 1989).

Meanwhile, RTI contends that the Bankruptcy Court clearly erred by not recharacterizing all of Nelson's loans as equity. The record, however, reflects that although the parties did not amend the original $500,000 promissory note, other contemporaneous writings, records, financial statements, and tax returns recognized the $1,500,000 as debt. Also, the Board approved $1,500,000 worth of loans. Moreover, the record reveals that RTI was not undercapitalized based on the testimony of a financial analyst. *See In re Lifschultz Fast Freight,* 132 F.3d at 351 ("Undercapitalization exists at inception "if, in the opinion of a skilled financial analyst, [the capitalization] would definitely be insufficient to support a business of the size and

nature of the [debtor] in light of the circumstances existing at the time the bankrupt was

capitalized.") (quoting *In re Mobile Steel Co.*, 563 F.2d 692, 703 (5th Cir. 1977)). The

Bankruptcy Court also found that Nelson was not a controlling shareholder based on his holdings

of only 8.86 percent of RTI's shares versus the Emerson's 66.84 percent. *See In re Outboard

Marine Corp.,* 2003 WL 21697357, at *5. Again, reviewing the entire record, the Court would

be hard-pressed to conclude that the Bankruptcy Court clearly erred in finding that Nelson's

advances of $1,500,000 were debt instead of equity capital. *See In re Outboard Marine Corp.,*

386 F.3d at 827; *see also Piraino v. Int'l Orientation Res., Inc.,* 137 F.3d 987, 990 (7th Cir.

1998) (to be clearly erroneous, a decision must be "more than just maybe or probably wrong; it

must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.") (citation

omitted).[4]

Next, Nelson contends that recharacterization of debt to equity is not a remedy that is

available to RTI in this matter because RTI did not have any other creditors. Nelson fails to

support his argument with any legal authority and his factual contention that RTI did not have

any other creditors is not supported by the record. Therefore, Nelson's undeveloped argument –

that is not supported by legal authority or the record – is waived. *See Fowler v. Caremark RX,

L.L.C.,* 496 F.3d 730, 743 (7th Cir. 2007).

Finally, for the first time on appeal Nelson raises the argument that the Bankruptcy Court

lacked authority to recharacterize any of his debt because joinder of the other RTI shareholders

---

[4] Even if the Court were to review the Bankruptcy Court's recharacterization ruling de novo, Nelson's advances up to $1,500,000 had the indicia of debt and not equity. *See Price v. CIR,* 142 F.3d 440 (7th Cir. 1998) (unpublished opinion) (citing *Roth Steel Tube Co. v. C.I.R.,* 800 F.2d 625, 630-31 (6th Cir. 1986)).

was necessary to do so.[5]  It is well-settled in this Circuit that arguments that are not raised in the bankruptcy court are forfeited on appeal.  *In re Cohen,* 507 F.3d 610, 614 (7th Cir. 2007).  Thus, Nelson's joinder argument must fail.

## II.    Equitable Subordination & Transfer of Liens to Estate

Next, RTI maintains that the Bankruptcy Court erred in failing to equitably subordinate Nelson's debt.  *See* 11 U.S.C. § 510(c)(1).  RTI also contends that the Bankruptcy Court erred in failing to direct the transfer of Nelson's liens on RTI's property to RTI's bankruptcy estate based on Nelson's inequitable conduct.  *See* 11 U.S.C. § 510(c)(2).

"Bankruptcy is not a 'free-for-all equity balancing act.'"  *In re Stoecker,* 179 F.3d 546, 551 (7th Cir. 1999) (citation omitted).  Instead, it "is a forum in which creditors prove the entitlements that state or federal law confers on them, and these entitlements are then enforced consistently with the provisions of the Code governing preferences, priority, and other issues that arise in the marshaling and collection of debts from a bankrupt debtor."  *Id.*  Section 510(c) of the Bankruptcy Code, however, allows courts to equitably subordinate claims based on creditor misconduct.  *See In re Lifschultz Fast Freight,* 132 F.3d at 344.

There are three requirements that must exist before a bankruptcy court can equitably subordinate a claim:  (1) the claimant engaged in inequitable conduct; (2) the misconduct resulted in injury to the debtor's creditors or conferred an unfair advantage to the claimant; and (3) the claim's equitable subordination is not inconsistent with the Bankruptcy Code.  *Id.* (citing *In re Mobile Steel Co.*, 563 F.2d at 700-01).  Courts must first determine whether the creditor

---

[5]  Although Nelson points to statements that were made by counsel on the record after the trial concerning joinder issues, Nelson never raised any joinder issues in his pleadings or during the course of trial.  (*See* December 28, 2006, Hr'g Tr. at 15.)

engaged in inequitable conduct, and "if there is none, then a bankruptcy court cannot subordinate a claim." *In re Lifschultz Fast Freight,* 132 F.3d at 344. Under this requirement, "the type of conduct that has been considered 'inequitable' generally falls within the following categories: '(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego.'" *Id.* at 344-45 (citation omitted).

In determining whether to equitably subordinate a claim, courts subject insiders' activities to a higher level of scrutiny. *In re Lifschultz Fast Freight,* 132 F.3d at 344. "An insider is a fiduciary of the corporation" and if an insider "breached the 'rules of fair play and good conscience' vis-a-vis the company and its creditors, the bankruptcy court can send her back to the end of the line." *Id.* (citation omitted). Under this standard, when the claimant is an insider, the debtor has the initial burden of setting forth evidence of inequitable conduct. *See id.; In re Kreisler,* 352 B.R. 671, 676 (N.D. Ill. 2006). If the debtor meets that standard, then the claimant must demonstrate good faith and fair conduct. *In re Lifschultz Fast Freight,* 132 F.3d at 344; *In re Kreisler,* 352 B.R. at 676. Although some courts have considered equitable subordination a question of fact, *see In re Joy Recovery Tech. Corp.,* 286 B.R. 54, 83 (Bankr. N.D. Ill. 2002), other courts have reviewed this question de novo. *See Herzog v. Leighton Holdings, Ltd.,* 239 B.R. 497, 504 (N.D. Ill. 1999); *see also Mungo v. Taylor,* 355 F.3d at 974 (courts review mixed questions of fact and law de novo). Under either standard, the Court affirms the Bankruptcy Court's ruling on equitable subordination.

On appeal, the parties do not dispute that Nelson is a fiduciary and insider as defined by the Bankruptcy Code under Section 101(31)(A), and thus his activities are subject to a higher level of scrutiny. *See In re Lifschultz Fast Freight,* 132 F.3d at 344. Instead, RTI argues that

Nelson, as a director of RTI, breached his fiduciary duties to the corporation,[6] and thus RTI has established Nelson's inequitable conduct under the first *Mobile Steel* requirement. *See In re Lifschultz Fast Freight,* 132 F.3d at 344; *In re Mobile Steel Co.*, 563 F.2d at 700-01. RTI was incorporated in Delaware, thus the Court applies Delaware law to its fiduciary duty analysis. *See Treco, Inc. v. Land of Lincoln Sav. & Loan,* 749 F.2d 374, 377 (7th Cir. 1984); *FDIC v. Miller,* 781 F.Supp. 1271, 1276 (N.D. Ill. 1991) ("laws of the state of incorporation generally govern the fiduciary duties of corporate directors.").

Because "directors of Delaware corporations have 'the legal responsibility to manage the business of a corporation for the benefit of its shareholders owners'" certain "fiduciary duties are imposed upon the directors to regulate their conduct when they perform *that* function." *North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 101 (Del. 2007) (emphasis in original). More specifically, "Delaware law imposes three primary fiduciary duties on the directors of corporations; the duty of care, the duty of loyalty, and the duty of good faith." *In re Abbott Lab. Derivative S' holders Litig.,* 325 F.3d 795, 808 (7th Cir. 2003) (citing *Emerald Partners v. Berlin,* 787 A.2d 85, 90 (Del. 2001)). "While the duties of due care and loyalty are largely regarded as separate and distinct under Delaware law, the duty of good faith has, at times, been considered, 'inseparably and necessarily intertwined' with the duties of due care and loyalty." *In re Fleming Packaging Corp.,* 370 B.R. 774, 783 (Bankr. C.D. Ill. 2007) (citing *In re Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 745-46 (Del. Ch. 2005)). As the Delaware Supreme Court has explained:

---

[6] After RTI became insolvent, Nelson owed a fiduciary duty to RTI's creditors. *See Production Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 790 (Del. Ch. 2004); *Geyer v. Ingersoll Publ'n Co.,* 621 A.2d 784, 787 (Del. Ch. 1992).

although good faith may be described colloquially as part of a "triad" of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. Only the latter two duties, where violated, may directly result in liability, whereas a failure to act in good faith may do so, but indirectly.

*Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del. 2006).

Under Delaware law, the fiduciary duty of due care requires that directors "'use that amount of care which ordinarily careful and prudent men would use in similar circumstances,' and 'consider all material information reasonably available' in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent." *In re Walt Disney Co. Derivative Litig*, 907 A.2d at 749 (citations omitted). "Liability for a director's breach of the duty of care may arise in two contexts." *In re Fleming Packaging Corp.,* 370 B.R. at 783 (citing *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959, 967 (Del. Ch. 1996)). The duty of care may be breached by either "(1) director action or nonaction following from an 'ill-advised or negligent' board decision, or (2) from "an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss." *In re Fleming Packaging Corp.,* 370 B.R. at 784 (emphasis in original); *see also In re Walt Disney Co. Derivative Litig.,* 907 A.2d at 749. In short, "the duty of care requires a director, when making a business decision, to proceed with a 'critical eye' by acting in an informed and deliberate manner." *Ivanhoe Partners v. Newmont Min. Corp.,* 535 A.2d 1334, 1345 (Del. 1987).

As far as the duty of loyalty is concerned, it is well-established under Delaware law that "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del. 1939). In other

words, under Delaware law, the duty of loyalty requires directors of a corporation to act in the best interests of the corporation and not to take actions that conflict with the corporation's interests or do it harm. *See id.*; *see also Pepper v. Litton,* 308 U.S. 295, 306, 310-12, 60 S.Ct. 238, 84 L.Ed. 281 (1939). "Most typically, a breach of the duty of loyalty occurs when a fiduciary appears on both sides of a transaction or receives a personal benefit not shared by all shareholders." *In re Fleming Packaging Corp.,* 370 B.R. at 789 (citing *In re Walt Disney Derivative Litig.,* 907 A.2d at 751). To clarify, self-dealing or self-interest occurs when a corporate fiduciary is on both sides of a transaction or "expect[s] to derive any personal financial benefit from [the transaction] in the sense of self-dealing as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984); *see also Cinerama Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1169 (Del. 1995).

Despite the nuance of Delaware corporate law as it pertains to a director's fiduciary duties, RTI fails to articulate whether Nelson breached his duty of care or loyalty and how good faith comes into play. The Court reminds the parties that "[g]iven our adversary system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Doherty v. City of Chicago,* 75 F.3d 318, 324 (7th Cir. 1996) (citations omitted). Nevertheless, from RTI's arguments, it appears that it is arguing that Nelson breached his fiduciary duty of loyalty because Nelson "pursued his self-interests as a creditor of RTI."

## A.    Nelson's Acquisition of the Bank Loan & Service of Default Notice

RTI first argues that Nelson breached his fiduciary duties when he acquired the Bank Loan while he was still serving as a director of RTI, especially because as a result of the

24

acquisition Nelson became a senior secured creditor. The Bankruptcy Court rejected RTI's

argument as follows:

> Nelson's acquisition of the Bank Loan was not "inequitable" in any way. The
> case law is clear that acquiring a bank loan for par while serving on a board of
> directors is not a breach of fiduciary duty and does not justify equitable
> subordination, even if that purchase is done in part to solidify that purchaser's
> own position. *In re ASI Reactivation, Inc.,* 934 F.2d 1315, 1321 (4th Cir. 1991)
> (where individual used his own funds to buy bank note, no evidence was
> presented that purchase was fraudulent or injurious to debtor, even when
> purchaser purchased the debt in part to solidify his position); *Mr. R's Prepared
> Foods, Inc.,* 251 B.R. at 30 (the insiders' purchase of the bank note and receipt of
> the bank's security interest left the debtor's other creditors in the same positions
> they would have been in had the bank collected the indebtedness, and neither
> conferred an unfair advantage on the insider, nor inflicted any harm upon other
> creditors); *Agincourt, L.L.C., et al. v. Stewart, et al. (In re Lake Country
> Investments),* Nos. 99-20287, 00-6064, 2001 WL 267475, at *12 (Bankr. D. Idaho
> March 19, 2001) (holding that an insider's acquisition of secured debt, without
> injury to the debtor or unfair advantage, does not justify equitable subordination).
> Furthermore, the parties have stipulated that Mr. Nelson received no special
> benefit due to his status or affiliation with RTI during the process of acquiring the
> Bank Loan.
>
> Moreover, the Subordination Agreement between RTI, Nelson, and the
> Bank made clear that the Bank could assign the debt to anyone it chose at any
> time without notice. From the origin of the Bank Loan, Nelson, other directors,
> and anyone else was free to buy the Bank's position without Notice to RTI or any
> other directors. Nelson acted in 2006 to do something that RTI had contractually
> consented to long before.

*In re Repository Tech., Inc.,* 363 B.R. at 887-88.

Next, RTI argues that Nelson's service of the Default Notice on RTI on the same day that

he resigned from RTI's Board constituted a breach of his fiduciary duty to RTI. The Bankruptcy

Court rejected RTI's argument stating:

> Nelson's delivery of the Default Notice to RTI the same day he resigned as
> Director was not a breach of his fiduciary duty to the corporation or its creditors.
> That is, it is not a breach of a director's fiduciary duty to lend money to a
> corporation, nor is it a breach of fiduciary duty to attempt to collect on a lien or
> debt once loaned even if the lender is a majority stockholder. *In re Charles*

*Crook Wholesale Produce,* 7 F.3d 222 (4th Cir. 1993) ("There is no prohibition against a dominant shareholder's lending money to a corporation."); *In re Brunner Air Compressor Corp.,* 287 F.Supp. 256, 264 (N.D.N.Y. 1968) ("There is nothing illegal in an officer or director lending money to his corporation provided he does not use his corporate position to defraud creditors or take unfair advantage of them."); *Marciano v. Nakash,* 535 A.2d 400, 405 (Del. 1987) (directors who advance funds to a corporation with a bona fide intention of assisting the business' efforts to remain in business do not forfeit their claims as creditors merely because of the relationship); *Lifschultz Fast Freight,* 132 F.3d 339, 347 (7th Cir. 1997) ("Assuming there was no deception, we see no reason to treat an insider's loan to a company more poorly than that of a third party's. To hold otherwise would 'discourage those most interested in a corporation from attempting to salvage it through an infusion of capital.'"); *In re ASI Reactivation, Inc.,* 934 F.2d 1315, 1321 (4th Cir. 1991) (finding that once an insider has made a loan to an entity, it is not per se inequitable for an insider to assert his rights as a lien holder). In this case, there is no evidence that Mr. Nelson attempted to defraud creditors or improperly utilize his position on the RTI Board.

*In re Repository Tech., Inc.,* 363 B.R. at 888.

Based on the facts in the record and pertinent legal authority, neither Nelson's acquisition of the West Suburban Bank Loan nor his service of the Default Notice while he was on RTI's Board was a breach of his duty of loyalty because there is no evidence of self-dealing, namely, that Nelson was on both sides of the transaction or that Nelson had self-interest as defined by Delaware law. *See Rales v. Blasband,* 634 A.2d 927, 933, 936 (Del. 1993); *Aronson,* 473 A.2d at 814; *see also North Am Catholic Educ.,* 930 A.2d at 92 (fiduciary duties imposed on directors when managing corporation's business). First – as unequivocally supported by the record – RTI agreed in the Subordination Agreement that the Bank could assign the Bank Loan to anyone without notice. As such, any director, shareholder, or third party could have done what Nelson did. Moreover, Nelson's insider status as a director was of no consequence, especially in light of the undisputed fact that Nelson did not receive a special benefit based on his insider status during the process of acquiring the Bank Loan. In fact, he acquired the loan under the same

terms as the bank.  Second, although Nelson solidified his position as a senior secured creditor as a result of purchasing the Bank Loan, James Emerson admitted at trial that Nelson's conduct did not harm RTI's other creditors.  In addition, there is no evidence of fraud, deception, or unfair dealing in Nelson's acquisition of the loan and the record indicates that Nelson did not use corporate funds for the purchase of the Bank Loan.  *See In re Lifschultz Fast Freight,* 132 F.3d at 347*; In re ASI Reactivation, Inc.,* 934 F.2d at 1321.  Further, Nelson purchased the Bank's interests in the Bank Loan for face value of the outstanding principle due.  As far as the timing of Nelson's service of the Default Notice occurring on the same day he resigned, RTI fails to make any arguments how this timing amounted to a breach of Nelson's fiduciary duties to the corporation.  As such, RTI failed in its burden of presenting evidence of Nelson's alleged breach of fiduciary duty based on Nelson's acquisition of the Bank Loan and service of the Default Notice.[7]  *See In re Lifschultz Fast Freight,* 132 F.3d at 344; *In re Kreisler,* 352 B.R. at 676.

### B.     Forbearance of Loan Payments

RTI also argues that Nelson's representations that RTI need not repay his loans until the company became profitable constitutes a breach of fiduciary duty.  In addressing this argument, the Bankruptcy Court concluded that although Nelson informed RTI's Board and individual officers and directors that they did not have to make payments on his advances several times between June 2004 and March 2006, Nelson never stated that he did not expect ***any*** payments of his advances.  Further, the Bankruptcy Court found that Nelson never renounced his rights to the

---

[7]  Although the Bankruptcy Court discussed Nelson's acquisition of the Bank Loan under Delaware's corporate opportunity doctrine, RTI makes no such arguments on appeal, and thus the Court need not address this issue. *See Steen v. Myers,* 486 F.3d 1017, 1020 (7th Cir. 2007) (absence of any discussion in briefs amounts to abandonment of claim).

payments. Indeed, the record reflects that the entire amount of the Nelson Note was scheduled to become due on August 1, 2007. Based on these facts, the Bankruptcy Court did not err in concluding that Nelson's conduct in seeking payment on his loans did not constitute a breach of his duty of loyalty under Delaware law. *See Rales,* 634 A.2d at 936; *Aronson,* 473 A.2d at 812. Further, any "injury" or "harm" that RTI may have suffered was its legal obligation to pay its debt, and thus RTI has not satisfied the second element of equitable subordination that the alleged misconduct resulted in injury to RTI's creditors or conferred an unfair advantage upon Nelson. *See In re Mobile Steel Co.*, 563 F.2d at 700-01.

### C. Preliminary Planning of New Corporation

RTI also argues that Nelson's preliminary planning to form a new corporation breached his fiduciary duties to RTI. Although RTI argues that as a fiduciary, Nelson cannot exploit his position as a director for his own personal benefit, RTI fails to develop its argument with legal authority except for citing the basic precepts of Delaware's breach of fiduciary duty standards. Meanwhile, the record reveals that although Nelson consulted his attorney about the possibility of starting a new corporation, Nelson never actually formed a new corporation to accept, hold, or manage RTI's assets or business. As such, assuming, *arguendo,* that Nelson's planning constituted a breach of his duty of loyalty, because Nelson did not form a new corporation during the relevant time period, the alleged misconduct did not result in injury to RTI's creditors and Nelson's preliminary planning did not give him any unfair advantage under the circumstances. *See Mobile Steel,* 563 F.2d at 700-01.

Finally, the Court notes the Bankruptcy Court's discussion of the consequences of Nelson's involvement in the corporation:

While equitable subordination must "be proportionate" to any wrong that it seeks to remedy, in this case no wrong at all has been established through proof that Nelson loaned Debtor a great deal of money that it needed and took assignment of the Bank Loan that RTI agreed could be freely assigned by the Bank to anyone.

Nelson's involvement in RTI actually benefitted the business. Indeed, the money loaned in relation to the Nelson Line of Credit is one of the primary reasons why Debtor has been able to stay in business as long as it has. In essence, Debtor is trying here to characterize the cash flow on which it heavily relied as a great wrong against it. Therefore, the attempt to equitably subordinate the $1,500,000 in Nelson loans and interest thereon has no credible traction when that attempt is based on the lending history. Nor is it credible when based on acquisition of the Bank Loan which came long after the $1,500,000 in advances by Nelson. It would seem more than disproportionate to subordinate the lending which was completed before 2004 because of actions that took place two years later in 2006. What the Plaintiff actually seeks is to subordinate to control of RTI and its majority stockholders the rights acquired by Nelson to demand payment of his $1,500,000 personal debt because he acquired the Bank Loan and thereby swept aside the contractual restraint imposed by the Bank on his right to force collection of the debt due to him. RTI also seeks to subordinate Nelson's collection rights to the Bank Loan he paid off and thereby checkmate Nelson's rights to collect at all either on the Bank Loan assigned to him, or on his $1,500,000 in loans. Plaintiff would have had to prove a terrible wrong by Nelson to justify such relief to oust Nelson from his rights to collect debts due him which, with interest, are close to $2 million. No such wrong was established.

*In re Repository Tech.*, 363 B.R. at 886-87.

Bankruptcy courts avoid using equitable subordination in all but extreme circumstances and where there has been a clear inequity. *See In re Lifschultz Fast Freight,* 132 F.3d at 349 ("A bankruptcy court should be doubly wary of using its power of equitable subordination."); *In re Kreisler,* 352 B.R. at 675 ("The doctrine of equitable subordination should be invoked only in extreme circumstances and only where a clear inequity has been wrought."). Based on the record before the Court – and the applicable legal authority – the present circumstances do not amount to the type of case where equitable subordination is warranted. The Court thereby affirms the Bankruptcy Court's equitable subordination ruling.

### III.     Dictum

Last, Nelson argues that the Bankruptcy Court erred in making findings of fact and drawing conclusions of law that went beyond matters necessary to resolve the issues presented. In other words, Nelson argues that this Court should strike "dictum" in the Bankruptcy Court's order.  Nelson specifically contends that the following language from the Bankruptcy Court's February 13, 2007 order is dicta: "The filing of this bankruptcy was a rational reaction to Nelson's actions, and was partially successful.  Therefore, the bankruptcy filing cannot be held to be in bad faith."

The Seventh Circuit defines dicta as what a court "says" not what it "holds."  *See Tate v. Showboat Marina Casino P'ship,* 431 F.3d 580, 582 (7th Cir. 2005).  The holding of a case includes the facts, the outcome, and the reasoning essential to that outcome.  *Id.*; *see also United States v. Elliott,* 467 F.3d 688, 690 (7th Cir. 2006) (language that does not play any role in the court's disposition is dictum).  In short, the above-cited language is part of the Bankruptcy Court's holding because Nelson based his dismissal motion on RTI's bad faith.  (06 B 04582, R. 84-1, Am. Mot. Dismiss, at 10-13.)  Thus, Nelson's argument that the Bankruptcy Court's language is dictum is defeated by his own motion requesting a finding of bad faith in support of dismissing RTI's bankruptcy case.

## CONCLUSION

For the foregoing reasons, the Court affirms the Bankruptcy Court's Judgment Order and

Findings of Fact and Conclusions of Law.

Dated:   January 15, 2008

**ENTERED**

_____

**AMY J. ST. EVE**
**United States District Court Judge**